## Case No. 2,135.

### BUNNEL et al. v. STODDARD et al.

[2 Am. Law Rec. 145.]

Circuit Court, S. D. Ohio. Oct. 24, 1866.

TRUSTS — FRAUDULENT DEALING WITH BENEFICIARIES—EQUITY PLEADING — MULTIFARIOUSNESS—MISJOINDER OF PARTIES — WAIVER OF OBJECTIONS—LACHES.

[1. The trustee of an express trust, created for the purpose of establishing title and recovering possession of a tract of land near a large city, wrote a letter to the heirs of one of the original beneficiaries, who lived in a distant state, purporting to give an account of the status of the litigation, and the condition and value of the property. The letter stated that it was carried by the writer's son, who was sent for the purpose of seeing about a partition which had been urged by some of the beneficiaries. The real purpose of the son's visit, however, was to buy the interests of the heirs, pursuant to a scheme previously arranged with his father, and in which he was to use his father's resources and credit. The letter contained evasions and suppressions of material facts, as did also the son's oral statements. By these means he procured conveyances of the property for less than one-fifth of what it would have sold for in the market. Held that, under the circumstances, the son sustained a trust relation to the property, which destroyed the rights he claimed to have acquired, and that his vendors were entitled to enforce the original trust against both him and his father.]

[2. The objections of multifariousness and misjoinder of parties come too late when raised by answer instead of demurrer, and not called to the court's attention until the hearing.]

[Cited in Jones v. Slauson, 33 Fed. 634.]

[3. The heirs of a deceased beneficiary under a trust in respect to real estate sued to set aside certain conveyances and to enforce the trust. It was claimed that the realty had, in equity, been converted into personalty, and that, therefore, the administrator, and not the heirs, was the proper party complainant. The estate of the decedent had, however, been fully settled, and its debts satisfied. Held, that there was no reason why the heirs and distributees could not maintain the suit.]

[4. A suit was brought to enforce a trust created by a person since deceased, and also to set aside certain conveyances procured from her heirs, as alleged, by fraud. The administrator of the ancestor, the living heirs, and the administrators of those who had died were joined as complainants. Held, that there was no valid objection to such joinder, as the whole controversy in respect to the trust property could be thus settled in one suit.]

[5. The rights of different parties in trust property may be enforced in one suit, when they claim under a common source of title, and assert that a joint wrong, involving the trust property, has been done them by the trustee and his confederate, against both of whom they claim a remedy.]

[6. A bill sought, among other things, to set aside a conveyance alleged to have been procured by fraud. The answer set up, inter alia, a deed of confirmation. At the hearing it was objected that the deed could not be attacked by evidence because the bill had not been amended so as to put its validity in issue. Held, that

the objection should have been taken before the hearing by motion to suppress the testimony relating to the subject, and now came too late.]

[7. The principle of a bar by lapse of time does not apply to the case of malversation by a trustee of an express trust; nor can it be availed of by one who, by confederating with the trustee, procures, by actual fraud, the property of the beneficiaries.]

[In equity. Bill by Amasa Bunnel and others, children and heirs of Lucy Bunnel, together with the administrators of certain deceased children, against Henry Stoddard and Asa P. Stoddard, to enforce a trust vested directly in Henry Stoddard, and to set aside certain conveyances in favor of Asa P. Stoddard, which were alleged to have been procured by fraud.]

Odlin & Cahill, R. C. Hurd, and I. M. Flagg, for complainants.

H. H. Hunter and I. A. Jordan, for defendants.

[Before SWAYNE, Circuit Justice.]

I. Major Amos Stoddard, of the army of the United States, died intestate and without issue in the year 1813. He left surviving him four brothers and two sisters: Philo Stoddard, Simeon Stoddard, Curtis Stoddard, and Eliakim Stoddard, and Lavinia Pierce and Lucy Bunnel. They were his only heirs-at-law. Each of them was entitled to one-sixth of his estate. The complainants, except two of the legal representatives, are the defendants and heirs-at-law of his sister, Lucy Bunnel. Major Stoddard, at the time of his death, claimed title to four hundred arpens of land, lying upon the Missouri river, in Calloway county, in the state of Missouri, and three hundred and fifty arpens in the county of St. Louis, in that state. (An arpen is about fifteen per cent. less than an acre.) Major Stoddard's title to the land in Calloway county was never questioned. It is worth from three to four thousand dollars. It is still undisposed of.

II. Major Stoddard's title to the land in St. Louis county was derived through mesne conveyances from the government of Spain. The lieutenant-governor of Upper Louisiana granted a concession of three hundred and fifty arpens (297¾ acres), with an order of survey, on the 29th of January, 1800, to Mordecai Bell. On the 29th of May, 1804, Bell conveyed to James Mackey. On the 26th of September, 1805, Mackey conveyed to Major Stoddard, who was then the civil commandant, under the United States, at St. Louis. Major Stoddard caused the concession to be located upon the land in St. Louis county, and the land to be surveyed on the 26th of January, 1806. The conveyances with the certified plat and survey were presented to the recorder of land titles of the district of St. Louis, on the 29th of June, 1808. The claim was filed for confirmation with the commissioners appointed under the

act of congress of March 2, 1805, and they rejected it.

III. After the death of Major Stoddard, the heirs employed Luke E. Lawless, Esq., then an eminent lawyer of St. Louis, to prosecute the claim, and agreed to give him for his services, in the event of success, one-fifth of the property. Lawless submitted the claim to another board of commissioners, appointed under the act of congress of the 9th of July, 1833. They decided on the 8th of June, 1835, it ought to be confirmed, and it was subsequently confirmed by congress by the act of July 4, 1836. On the 15th of November, 1836, the heirs, pursuant to the agreement with Lawless, conveyed to him an undivided fifth part of the tract. On the 12th of October, 1837, Amos A. and Daniel Stoddard for themselves, and as attorneys in fact of the other heirs, entered into a contract with the defendant, Henry Stoddard, whereby it was agreed as follows: "Said Henry Stoddard is to use his best endeavors to perfect the title to said lands, and to obtain patents from the United States therefor, and for that purpose he is to go to the city of Washington if he judges it advisable so to do, and he may procure said patents to issue in the names of said heirs of Major Stoddard, or in his own name in trust for the heirs, or in the name of any other person or persons, as he shall judge proper, and shall be able to procure them from the United States; and when a legal title shall be obtained he is to cause a suit or suits to be instituted in the United States courts, to establish the title and right so derived under Major Stoddard, deceased; and when the title and right shall be established or admitted to either or both said tracts, said Henry Stoddard.is to make sale of either or both said tracts, or any part of either, as he shall judge most for the interest of all the parties concerned; and the said Daniel and Amos A. Stoddard will make deeds to the purchasers from said Henry, and he is to direct in all such litigation as may grow out of the business, and he is to employ such counsel, attorneys, and agents as he may think necessary, and out of the proceeds of sales first made said Henry is to pay all the expenses that may in any way or manner attend such litigation, assertion, and establishment of title, and also the fees of any counsel or attorney and agents that he may employ in the business; but for his own services said Henry is to receive no other compensation than as is hereinafter provided, but said Henry is to be repaid out of such proceeds any and all sums of money that he has or may hereafter actually pay out, including his traveling expenses on any journey performed on this business; and said Henry having made one journey to St. Louis in April, 1837, and having then paid sundry sums on account of the land and for his expenses, the money that he then or may hereafter expend is to be refunded to him out of the proceeds of sale; and said Henry is to keep an account of the money he may pay out in this business, and his account, verified by his oath, is to be received as his account of money paid out by him in this business; and after paying out of the proceeds of the sale of said lands as aforesaid, the costs, expenses, &c., as above provided for, the said Henry is to have for his personal services in the business one-tenth part of all the proceeds of sale of each and both said tracts (that is to say, of the proceeds of sale, all money actually paid out by the said Henry is to be refunded to him, and the balance is to be so divided as that said Henry is to have one-tenth part, and the heirs of said Major Stoddard and said Lawless the residue, according to their respective rights and interests, as before stated; and the portions which said heirs are respectively entitled to, said Henry agrees to pay them or their before-named attorneys in fact, or one of them, as soon as he shall receive the same, on request made; but if the title to none of the land shall be established, the said Henry is to receive nothing for his services or expenses)." Afterwards Henry Stoddard, to enable him the more effectively to execute the purposes of the agreement, advised that the legal title should be conveyed to him in trust, and thereupon Simeon Stoddard, Curtis Stoddard, Joseph Bunnel, and Lucy, his wife, Jonas Foster, and Lavinia, his wife, Daniel Stoddard, Lucy Cowan, and Daniel Morgan and Aroa, his wife, conveyed accordingly. This conveyance was made in the year of 1839.

IV. Upon the 23d of April, 1846, Henry Stoddard, as the agent of the heirs, entered into a contract with the Hon. Thomas Ewing, whereby it was agreed that Mr. Ewing should attend to all the litigation pending, or which might arise, involving the title of the heirs in the circuit and supreme courts of the United States; and that he should have for his services ten per cent. of what the heirs might receive upon the sale of their interests in the property. On the 17th of February, 1815, congress passed an act whereby it was provided that any person owning lands in the county of New Madrid, in Missouri territory, on the 10th day of November, 1812, and whose lands had been materially injured by earthquakes, should be authorized to locate the like quantity of land on any of the public lands of the said territory, the sale of which is authorized by law. Persons owning less than 160 acres were authorized "to locate and obtain any quantity of land not exceeding 160 acres." It was further provided: "Nor shall any person be entitled to locate more than 160 acres, nor shall any such location include any lead-mine or salt-spring." 3 Stat. 211. The recorder of land titles for the territory was authorized to receive proof, and issue the proper certificates for location and survey. On the 28th of November, 1815, a certificate was duly issued to Eustache Peltier, authorizing him to locate not exceed-

ing 160 acres. On the 24th of October, 1816, an entry was made under it, which included 47 21-100 of the concession to Bell as located by Major Stoddard. On the 29th of May, 1818, Martin Coontz made an entry under another New Madrid certificate which covered the concession of Bell to the extent of 1 63-100 acres. The aggregate of interferences under both entries was 48 83-100. . The heirs of Major Stoddard brought an action in the circuit court of the United States for the district of Missouri to recover the land. The case was tried at the April term, 1842. The court instructed the jury that the plaintiff's were not entitled to recover either tract, and a verdict and judgment were rendered for the defendant. The case was taken by a writ of error to the supreme court of the United States. That tribunal, at the January term, 1844, reversed the judgment. The court said: "The holder of a New Madrid certificate had a right to locate it only on public lands which had been authorized to be sold. Peltier's location was made in 1816, and his survey in 1818; the location of Coontz was made in 1818, and his survey in 1818. At those dates there can be no doubt that all lands claimed under a French and Spanish title, which claim had been filed with the recorder of land titles, as the plaintiff's claim had been, were reserved from sale by the act of congress above stated. * * * On the above facts the question arises whether the defendant's title is not void. * * * No title can be held valid which has been acquired against law. Such is the character of the defendant's title so far as it trenches on the plaintiff's." Stoddard v. Chambers, 2 How. [43 U. S.] 311. This was inevitably fatal to all titles derived from the New Madrid certificates. The court was unanimous. Nothing further is disclosed in the record in regard to this case, but it appears by the answer of the defendant, Henry Stoddard, that he received possession of the premises. In the subsequent case of Heirs of Stoddard v. Mills, the same questions arose and were decided by the supreme court in the same way. The rulings in Stoddard v. Chambers, were re-examined and unanimously affirmed. The court say, in conclusion: "If the New Madrid location was made in violation of law, it is not perceived how any right could be acquired under it." This case was decided at the January term, 1850; four-fifths of forty acres, less one-sixth and one-twelfth, were involved in the controversy. Mills v. Stoddard, 8 How. [49 U. S.] 345. Henry Stoddard had ordered suits to be commenced against all the other parties holding adversely any part of the tract, and such suits were pending in the circuit court of the United States when the case of Mills v. Stoddard was decided. At the succeeding April term of that court, judgments were rendered against the defendants by consent, in fifteen of the twenty cases; four were abated by the death of the defendants, and one was dismissed, the suit having been instituted by mistake against a party not in possession. The case of Easton v. Salisbury, decided at the December term, 1856, of the supreme court of the United States, was certified up from the supreme court of Missouri, under the 25th section of the judiciary act of 1789. The plaintiff claimed under a New Madrid certificate. The court below decided against him. The supreme court affirmed the doctrines of Stoddard v. Chambers [supra], and held, further, that the certificate in that case was void under the act of congress of the 26th of April, 1822 [3 Stat. 668], because it was not located within a year from the date of that act. The judgment below was affirmed. Easton v. Salisbury, 21 How. [62 U. S.] 426. Guitard v. Stoddard [16 How. (57 U. S.) 494] was decided by the supreme court of the United States at the December term, 1853. It was taken into that court by a writ of error to the circuit court of the United States for the district of Missouri. The plaintiffs claimed title to one arpen in width by forty in length of the Stoddard tract. The plaintiffs were defeated in the court below. The supreme court reversed the judgment, holding that a title to a common field lot might be sustained by oral proof of occupancy or cultivation prior to the 20th of December, 1803, and without documentary or other evidence of any concession or authority from the government of Spain or France, while those countries respectively owned the territory. The case was afterwards tried upon the merits in the court below, and the plaintiffs were again and finally defeated. Daniel R. Garrison says: "In the case of Savignac v. Garrison [18 How. (59 U. S.) 136], it was for some time doubtful whether Savignac would not maintain his title by possession, under the testimony of the old French witness. This covered, however, a very small portion of the tracts. We now own the title or claim of Savignac. Stoddard paid no portion toward compromising the claim. They manufactured evidence about as fast as I could get hold of the truth, so that I had to assist the lawyers and watch the witnesses on the other side. The case would otherwise, probably, have been lost." This is all the litigation relative to the property which the record discloses. Other litigations upon other claims may have been talked of as late as January, 1851, but none ever arose.

V. Luke E. Lawless conveyed his one-fifth to H. R. Gamble. Gamble appears to have taken possession of a specific part of the tract, and to have conveyed to Mills and Beaumont. Before the decision in Mills v. Stoddard he made a parol agreement with Henry Stoddard, that if the Stoddard title should prevail, he, or those claiming under him, should have the tract, and that if it were more valuable than one-fifth they should pay the heirs the difference, and if less valuable they should take the difference

in land. In pursuance of this agreement on the 1st of April, 1851, Henry Stoddard conveyed to Mills and Beaumont. Upon being surveyed the tract was found to contain 42 70-100 acres. John J. Murdock, who had acquired the interest of two of the heirs of Philo Stoddard,—the legal title of which had not been vested in Henry,—joined with him in the deed. Mills and Beaumont thereupon paid $5,403.09 as owelty of partition. On the 28th of June, following, Murdock and Henry Stoddard entered into a written agreement that the residue of the premises, except 6 29-100 acres, to which an adverse claim had been set up by P. Lyndall, should be surveyed into lots, streets and alleys, and the lots offered at public sale,—the sale to commence on the 1st of October, 1851.

VI. Prior to the agreement with Murdock, and prior to January, 1851, Henry Stoddard had determined to lay out the residue of the tract into lots and to sell them at public auction. Amos A. Stoddard says that before that time he "had frequent conversations with him as to the most profitable way of bringing the property into market for the benefit of the heirs. I can not tell how often we have conversed on the subject. He said that it was his opinion that it would be best to survey the tract into lots and sell them at public sale. This was the opinion of both of us." Wm. H. Cozzens was asked whether he had heard Henry express himself to the same effect prior to January, 1851. He answers: "I heard Mr. Stoddard, in conversation with other persons, speak of the suitableness of the tract for being laid out into lots. I heard him so speak in the office of Leffingwell & Elliot. This was the time the lot was being surveyed and laid out into lots about the spring of 1851. I heard Stoddard speak in the highest and most glowing terms of this land, and gave it as his experience that land having that location would ultimately become very valuable for building purposes, and that all large cities made rapid improvements on their suburban property, and that after an inspection of our city map, he stated that we had not laid out sufficient land to answer the growth of the city, for the coming ten years." This purpose of Henry Stoddard was carried out in the fall of 1851. He laid out the property as an addition to St. Louis. The streets correspond with those of the city which are produced through it. The dedication bears date on the 9th of September. The lots were offered for sale subsequently in that month. Henry Stoddard says in his deposition: "Nominally they were all sold. Such lots were sold to actual purchasers as could be sold, which amounted to $178,543.01, and the residue were taken by the parties in order to effect a partition, and it was regarded by the parties as a partition, which amounted to $518,679.31. I cannot give a particular list from memory, but refer complainants to deeds on record in St. Louis." These two sums make an aggregate of $697,222.32. He says he bid in for himself, his co-defendants, Asa and Daniel Stoddard, by way of partition, lots to the amount of $224,074.96. All the lots have steadily and largely advanced in value since that time.

VII. On the 1st day of February, 1851, the defendant, Asa P. Stoddard, bought from Amasa, Anthony S. and Lucy Bunnel, and on the 6th, from Alva C. Bunnel, their respective shares of the estate of Major Stoddard. Each owned one-seventh of a sixth in right of their mother, Lucy Bunnel, deceased, who was one of the sisters of the intestate. He paid to each, as the consideration, the sum of one thousand dollars, and took from each a separate conveyance. They were the same mutatis mutandis. The granting part was as follows: "Have bargained and sold, and by these presents do bargain, sell, and convey to the said Asa P. Stoddard, all my right, estate, title, and interest as one of the seven heirs-at-law of said Lucy, and also of said Joseph Bunnel, both deceased, in said two tracts of land, and in the proceeds of the sale thereof, to be made by the said Henry Stoddard." Each instrument, besides a covenant against the acts of the grantor, contained a covenant of warranty, as follows: "And further, that I will warrant and defend the said one-seventh part of one-sixth part so bargained and sold to the said Asa against all claims and demands whatsoever." They are drawn with great fullness of recitals and with elaborate care. The grantee took no risk as to the title. If it had failed he would have been entitled to recover back what he had paid, with interest. The residences of the grantors were as follows: Amasa and Lucy Bunnel lived in Laporte county, Indiana; Anthony S. lived in Marshall county, in that state; Alvah C. lived in Walworth county, Wisconsin; Aviah Bronk, their sister, and her husband, Nicholas Bronk, had sold her seventh of her mother's sixth to Philo. Green, for three hundred dollars. They claimed that Green had defrauded them, and that the contract was void.

VIII. On the 19th of August, 1851, Asa P. Stoddard entered into a contract whereby it was agreed that he should take all the necessary steps to get the contract with Green set aside; and if he succeeded, the Bronks agreed to sell and convey to him their one-seventh of one-sixth for the sum of eight hundred dollars, in addition to the three hundred dollars paid by Green. Asa, with the aid of his father, prevailed upon Green to rescind the contract, and on the 9th of October, 1851, Bronk and wife conveyed to him their one-seventh. The granting part of the deed is the same with that in the deeds executed by the Bunnels. It contains no warranty. On the 18th day of June, 1856, Bronk and wife executed to Asa a deed of confirmation. He proposed to pay, and did pay them nine hundred dollars as

the consideration. When the contract was made and the first conveyance was executed, Bronk and wife lived in Oswego county, New York. When the deed of confirmation was executed they lived at, or near, Saginaw, Michigan. In April, 1851, Mr. Ewing, who, for years, had been counsel for the heirs in the litigation touching the property, bought the sixth belonging to Mr. Foster, for $36,000. Asa was interested in the purchase. His father was his surety in the notes which he gave for the purchase money. This purchase was about two months after the purchase by Asa from the Bunnels. On the 12th of June, 1851, Asa and Mr. Ewing bought two-thirds of a sixth from Amos A. Stoddard for $24,000. Henry Stoddard was present and became the surety of Asa. In July, 1851, Henry Stoddard and Asa visited Mrs. Margaret Stoddard, at Boardman, in Ohio, and offered to buy her interest, which was one-third of a sixth, at the rate for a sixth of $36,000. She refused to sell. Asa's purchase from the four Bunnels was made at the rate of $7,000 for a sixth, and from Mrs. Bronk at the rate of $7,700 for a sixth, with the addition of the value of his services in the controversy with Green. On the 6th day of April, 1863, the complainants filed their bill in this case. It charges: That Henry and Asa Stoddard confederated and combined to defraud the vendees; that they suppressed material facts and made false representations; that they were enabled thereby to buy, and did buy, the property at grossly inadequate prices. It prays that the release given by the vendors be annulled and held for naught; that the trust committed to Henry Stoddard be enforced; that he and Asa be compelled to account and to pay to the complainants what they are entitled to receive; that the lots conveyed by Henry to Asa, and those unsold, be decreed to be held by the defendants respectively, subject to the equitable rights of the complainants; that, as to such property, the trust be annulled on account of the fraudulent conduct of the trustees; that the rightful proportions therein of the several complainants be ascertained and established; that the defendants be decreed to convey such property, with covenants of special warranty, and for general relief. The answers deny all the allegations of the bill imputing fraud or indirection to the defendants. They aver that Henry was in no wise interested in the purchases; that Asa bought solely for himself; that the property at the time of the purchase was depressed in value by doubts as to the security of the title, by the difficulty of getting possession of a large part of the premises; that the conduct of Asa was marked by entire good faith, and that he gave for the property all which at that time, and under the circumstances, it was worth. It is further alleged that if the sale by the Bronks was invalid, the invalidity was cured by their subsequent deed of confirmation. It is claimed on the proof that the price of real estate in St. Louis in January, 1851, was depressed by the recent prevalence of cholera, and by the great fire in that city.

IX. The validity of the sales depends upon the facts and the law of the case. These will now be considered. And first the facts: The sales were made in the winter and summer of 1851. Asa was then twenty-four years of age. He was unmarried, and had always lived in his father's family. He had occasionally been a clerk for others, but had never been engaged in any business for himself. The extent of his means was a fund in the hands of his father, as his guardian, which, with interest to the 26th of January, 1851, amounted to $2,919.83. In the fall of 1850, he visited St. Louis with his father, and was there about three weeks, at the expense of the trust fund. In a letter of the 14th of January, 1851, to Anthony C. Bunnel, his father says: "My son and I went to St. Louis, and was there nearly a month attempting to make a partition, but could not effect it." During a part of the time Asa was confined by sickness. He rode over the property. While there he heard of the sales of the interests of some of the heirs. He then conceived the idea of buying himself, and made inquiries with that view.

The evidence discloses that Henry Stoddard was a man of business and a practicing lawyer of marked ability. He had been connected with the property, as counsel and trustee, since the year 1837. He was interested in it to the extent of ten per cent. as a compensation for his services. He visited St. Louis frequently. He was there in April, and again in October and November, 1850. In a letter to Daniel Stoddard of the 9th of December, 1844, he said: "Amos had a conversation (he says) with Governor Miller, of Missouri, who advised him not to make a compromise—that the property was increasing in value rapidly, and will double in value every four years." In another letter to Daniel Stoddard, of the 19th of January, 1846, he said: "I do not think the land at St. Louis is as valuable as you say the newspapers represent it; but it is still of great value, and increasing, though I could not form any very accurate estimate." In a letter from Amos A. Stoddard to Henry, of the 2d of April, 1849, Amos said: "When we commenced in 1837, its value was one hundred dollars; it is now considered by professional men to be worth one thousand dollars per acre." This letter is dated at St. Louis. Amos was one of the heirs, and was then living on the property. In a letter to Henry Stoddard of the 5th of March, 1850, Amos said: "The property has become exceedingly valuable, so that in fact we are gaining by the delay by the litigation; but we are under no obligation to our opponents for it. Our part is now thought by some to

be worth a quarter of a million of dollars. I doubt it." In a letter from Amos to Henry, of the 30th of November, 1850, Amos said: "There is some prospect that we will make sale of father's interest here, either to the settlers or speculators. The former have offered at the rate of $800 per acre, which we suppose will be in or about twenty-five acres." Theodore Green says in his deposition: "I recollect of seeing Henry Stoddard frequently during several years previous to 1851. I had conversations with him myself, and heard him converse with others, in reference to the Stoddard property. My impression from these conversations was that he considered the property very valuable. I can not state the exact time of these conversations; some of them were in 1850." Jonas Foster testifies: "Sixth question—What, at the time (in 1850), was Henry Stoddard's opinion of the value of the property? If he named the sum, please state what it was; if not, state in what terms he spoke of it. Answer—He did not name any sum that I can recollect. He spoke of it as very valuable. He had consulted with surveyors and auctioneers as to the best plan of laying it out and the best time of bringing it into the market."

On the 18th of December, 1850, Amasa Bunnel addressed a letter to Henry Stoddard, in which he said: "I understand that the suit concerning our property is brought to a close, and decided in our favor. I want to learn how, and in what condition it is in. I understand Mrs. Morgan has sold her share for $1,500. There are seven heirs of us. I should like to learn what you think my share is worth. I have had an offer for it. Please write soon. Direct your letter to Laporte, Indiana." On the 14th of January following, Henry Stoddard replied. The letter is long and elaborate in its details as to the property. The parts most material to the present controversy are as follows: "Your interest, then, is one-seventh of one-sixth of three-fifths, subject to the deductions for my expenditures. I cannot state what they will amount to, for they are all not yet paid. I lately received a letter from Mr. Ewing that there is a bill of costs to pay at Washington. The litigation has been pending since 1837 or 1838, in one form or another, and I have generally been once, and more recently twice, a year to St. Louis, and twice or three times to Washington, and there are several bills yet to pay at St. Louis, including lawyers' fees there. Although the supreme court has twice decided Major Stoddard's title to be good, yet we have not yet got into possession of but part of the land; and when we were down last fall some of those in possession manifested a disposition to have further litigation, but I trust they will think better of it and give it up. * * * When we were at St. Louis in October and November last, H. A. Stoddard and his brother and Dean expressed a very great desire

that when we should get into possession, and shall have made a partition with Mills, Beaumont, and Bredell, that I would divide the rest and set off to each his part of the land, so that they may manage it in their own way. I told them I should be very glad to do it, as it would save me the trouble of selling it, but by my contract I was bound to sell, and divide the money, and that without the consent of at least a majority of heirs, I could not divide it among the heirs as they wished, and at their urgent request I agreed to send to the heirs, and see if they would consent to a division instead of a sale; and it is for the purpose of presenting this question for your consideration that I have sent my son, the bearer of this, to see you, and I have made the foregoing statement that you may have the whole statement before you. I am very willing to divide if all the parties wish it, and will agree thus to change my contract, for by so doing I shall get clear of a good deal of trouble. * * * The land near St. Louis is far more valuable than the land in Calloway county, and if we can once get into full possession, and get partition with Mills and Beaumont, and with Bredell (as I think we can), so that we can sell, it will no doubt sell for a good deal of money, but it is utterly impossible to say what it will sell for." To this letter was added a postscript which bears date on the 18th of January, four days after date of the letter. It is as follows: "P. S. Since preparing the above, my son has stated to me that if he can agree with you, your brothers and sisters, for your interest in the property, he will purchase. He does not go prepared, I believe, to pay for all your shares, but if he agrees with you and gives his notes, I will guaranty their payment as he shall agree, and you can hold this letter as binding me as his security. I several years since, while he was a minor, sold land which he received from his grandfather, on the side of his mother, and from an uncle, and the money is still in my hands, and will pay it for him."

On the day of the date of this letter to Amasa, Henry Stoddard addressed a letter to Anthony S. Bunnel, in which he said: "I have made some advances since I wrote to you last summer, but I have not yet got possession of all the lands. My son and I went to St. Louis in October, and was there nearly a month attempting to make a partition, but could not effect it. I expect to go down early in the spring to see if I can get possession, which I regard as very important. You can see the letter which I have written to your brother, as it is open."

On the 15th of the same month of January, Anthony S. Bunnel, in a letter of that date to Henry, said: "I would like to know how you get along with the St. Louis business. Can you tell us when we will get something from that property? Tell us as near as you can how much there will be for mother's

heirs." On the 25th of January, 1851, Henry replied: "My son, Asa P. Stoddard, left home on the 22d inst. to visit you and your brother in Laporte, and I gave him letters that answer all your inquiries, and I trust that before this reaches you by mail he will have been with you and you will have seen his letters." Asa made the journey in midwinter on horseback. He traveled over five hundred miles. He took with him the letter to Amasa open, and instruments of conveyance in blank prepared under the direction of his father, and ready to be filled up for execution by the heirs. His father furnished him with seven hundred dollars and the guaranty contained in the postscript. He had seen the letter of inquiry of Amasa, and had conversed with his father as to the price to be paid. The counsel for the complainants insist that the reason given in Henry's letter for sending Asa was a simulated, and not a real, one. It is to be regretted that no testimony touching this fact appears in the record, but that of Henry Stoddard. Amos A. Stoddard says that, before 1851, he and Henry had frequent conversations as to the best mode of disposing of the property, and that they concurred in opinion that it should be surveyed into lots, and the lots sold at public sale. He is silent upon the subject of a division. It does not appear that any such application was made to the heirs in Ohio, though they were much nearer, and owned a much larger share of the property. After the conveyances were obtained from the Bunnel heirs, it does not appear that Henry ever again suggested the matter to any one. Whence the necessity of sending Asa on so long and expensive a journey at that season of the year? Why was not the letter with the form assenting to the division, which he took with him for the heirs to sign, sent to them by mail? With that letter before them they could have decided whether to sign or not, as well without as with his presence. There was no difficulty in reaching them by post. Neither of the heirs had ever been at St. Louis. They knew little of the value of the property. They were dependent upon the trustee and his son for information upon which they were to act. The letter to Amasa was discouraging in its tone. While full and elaborate in unessential details, it was wholly indefinite upon the material points of inquiry in the letters of Amasa and Anthony: it did not disclose the facts that Amos had written to him in 1849, that professional men considered the property then worth one thousand dollars an acre; nor that in the fall of 1850, the settlers offered eight hundred dollars an acre; nor that in the spring of 1850, the part of the property belonging to the heirs was thought by some to be worth a quarter of a million dollars, though he doubted it; nor that he had determined to proceed to lay out the property into lots and sell them at public auction. It cannot be doubted that Henry Stoddard

knew as much of everything relating to the property as any other person, nor that he communicated all he knew to Asa, on their acknowledged consultations before Asa's departure on his mission. It is not pretended that either of the facts adverted to was communicated by Asa. Asa not only acquired his information at the expense of the trust, and by his association with the trustee, but he visited them charged with a duty in relation to the trust property. That duty was to lay before them fairly the proposition for a division. He went also animated by a personal interest in direct antagonism with its faithful performance. He says, in his deposition: "My father's purpose in sending me with the letter of the 14th of January, 1851, and the form for consent to partition, was to obtain the consent of the Bunnel heirs to partition. My own purpose was to purchase their interests, if I could, upon fair terms." It was competent for him to purchase, but both the law and the rule of sound ethics required that the heirs should be put upon a footing of perfect equality as to knowledge with himself, and that all his dealings with them should be characterized by the most explicit frankness and entire good faith. Asa staid at Anthony's one or two days. He said to Anthony "that he knew the situation of the property," and that "he knew the worth of it, and that Anthony's interest would not amount to one thousand dollars. He wanted to get it for eight hundred dollars." Further, he said: "The business at the time was not settled, and probably would not be settled for a number of years. It might remain for the length of time it had been in law." That time then was more than thirteen years. When Anthony executed the conveyance he said: "He might not get his share in his lifetime if he waited for the business to be settled, and for that reason, perhaps, he had better sell his share to Mr. Stoddard." Anthony S. Bunnel accompanied Asa to the house of Amasa Bunnel. Asa was there two or three days. He said there, to Anthony, Lucy, and Amasa, "that he had been on the property a number of times, and knew what it was worth. He offered me seven hundred dollars apiece for their shares. As before stated, he ultimately gave a thousand." Amasa says: "We had no knowledge of the situation or value of our interests in said property, except as drawn from Henry Stoddard and from what Asa said at that time." He says further, that he sold to Asa "because he said he was paying me more than my interest in said property was worth, combined with the information received from his father, Henry Stoddard, in the letter brought by him. I relied upon his statements, combined with the information brought from his father, and not upon my own knowledge or judgment in the matter." George W. Gilchrist, a witness in nowise interested or connected with the parties, speaking of the con-

versation of Amasa, Anthony, and Lucy, with Asa, says: "He stated that he had seen the property, in company with his father; that he knew the value thereof and its situation, and that it was still in litigation." He stated "that his father sent him to buy out the heirs, and gave him permission to use his name in any contract he might make in relation thereto, and also agreed to furnish him all the money that was necessary, and allowed him to draw on him for any balance that might be due." Having purchased of Amasa, Anthony, and Lucy, Asa proceeded to Walworth county, Wisconsin, where Alvah Bunnel then lived. He took Amasa with him and paid his expenses. To Alvah he made substantially the same statements which he made to the other heirs. This passage occurs in Alvah's deposition: "Question —Did he make known to you a proposition from his father to have it divided instead of sold? A.—Not that I recollect. He spoke of some of the disadvantages of dividing it." In July, 1851, L. T. Foster asked Asa what he had paid the heirs from whom he had bought. He replied that he "paid them all they asked," and said, further, "that he thought he had bought so as to make a fine thing of it." He also said "that he was going on in a few days to buy out an heir's interest that lived on the Hudson river." The heir referred to was doubtless Mr. Bronk. It appeared from a letter of Henry to Mrs. Bronk, on the 7th of June, 1851, that she had written to him on the 25th of May, stating that she had sold her seventh to Green for three hundred dollars, and inquiring as to the validity of the contract, and the value of the property. He replied, in the letter referred to: "I can only state, that the price at which you sold your interest in the proceeds of property in Missouri, which descended to your mother from Major Stoddard, is not as much as my son paid for other similar shares, nor is it as much as it is worth. But in regard to the contract, I cannot form any opinion, as the facts and representations are not known." On the 4th of August, 1851, Mrs. Bronk, at the suggestion of Henry, notified him as trustee to disregard the deed to Green, alleging that it "was obtained by false and fraudulent representations." Early in that month Henry was at the house of Dean Lake, in Cayuga county, New York. Lake was the brother-in-law of Mrs. Bronk, and had been the agent and attorney of herself and husband in regard to the St. Louis property. While at Lake's Henry Stoddard said Asa would be there shortly to buy out the heirs in that neighborhood, and asked Lake to assist him. Lake says in his deposition: "I asked him why he did not buy out these heirs himself. His reply was, he was acting as trustee and it would not be lawful for him to do it; but Asa, he thought, would be here right away and would be willing to make purchase, and that any contract he made, he would indorse

and make good, and if any money was wanting it should be forthcoming." In his cross-examination by the defendant's counsel, this witness says: "Henry Stoddard stated to me at my house, that" (Green's purchase of the Bronks) "was a plain case of fraud, and that he had got some information that he did not feel at liberty to reveal, that he thought there would be no doubt of making it void. He also asked me if I thought they (Bronk's folks) would be willing to appoint Asa attorney to accomplish the object; and that if Asa could make a contract to buy their interest in case he set aside Green's purchase, he thought Asa would buy her interest. I told him I thought they would follow my counsel." The information referred to by Henry Stoddard, which he "did not feel at liberty to reveal," was that Green had committed the crime of forgery. It appears that Henry went from Lake's to New York. On the 13th of August, he addressed the following letter from that city to Lake: "Mr. Dean Lake: Dear Sir—My son has arrived here, and after dispatching some matters, I believe he has concluded to return home by Oswego and Sterling, to see if he can make any arrangements with you, and Wortz and Bronk, and I write this to send by him. In a short note that I sent you from this place, a few days since, I stated that I had got some information that I thought I might make use of for the benefit of Wortz and Bronk, and the more I reflect upon it, the more am I satisfied that I can use it for their benefit, though I may be disappointed in it. Asa can inform you where I have been since I parted with you at Auburn, but under the circumstances I have thought it not advisable to acquaint him with the facts I allude to, as it may be that if I succeed, I shall be under the necessity of suppressing the whole from everybody but Green and Morgan, who are most interested. I have informed Asa of your and my conversation, and of your suggestion, and wish to get the contract of Bronk and Wortz with Green rescinded; and he is willing to act under powers of attorney from them, provided he can have contracts with them in the event of the former ones with Green being set aside, and he has prepared powers of attorney, under my direction, to be executed by them severally, and also contracts, one of which I drew up to be signed by them if they shall agree upon the terms, and in this matter he is acting entirely on his own account. If they can bargain with him he will be able to attend to it for them as well, and perhaps better, than almost any one else, as I shall avail myself of my newly acquired information to aid him. * * * P. S. If Asa shall not have money with him to answer your expectations—if he contracts with you—he will send you a draft on this city for two or three hundred dollars as soon as he gets home."

This letter was delivered to Lake by Asa. Lake accompanied Asa to see the Bronks.

Henry Stoddard had prepared in New York the papers for them to execute, and they were accordingly executed. Lake says: "That at the time of their execution Mr. Bronk spoke of not knowing the value of that property, and Asa said that father had the whole control of that matter, and knew all about it, or we knew all about it. He said he thought one thousand dollars was all he could afford to pay her for her interest. He thought that was all it was worth. He said he had bought Anthony Bunnel's, and Amasa, Alvah, and Lucy Bunnel's interest, and paid them a thousand dollars each. He made the remark that there was no telling how much it would cost yet to get the matter settled up. I remarked to him that I thought I understood from his father that the litigation was settled; and his reply to that was, they had a number of suits decided in their favor, but there was no knowing how many more might come up, as those people there were very obstinate. There was here the suppression of the same facts adverted to in relation to the sales by the Bunnels. The further facts were suppressed— that a partition had been made with Mills and Beaumont; that he had entered into a written agreement with Murdock, that Mr. Bredell's share should be laid out into lots and sold at auction with the other property, the money and not the land to be divided, the sales to commence on the 1st of October following; and that measures were then in active progress to prepare the lots for market accordingly; that Asa and Mr. Ewing had bought the interest of Amos A. Stoddard and of Mrs. Foster, at the rate of $36,000 for a sixth; that Asa offered to buy the interest of Margaret Stoddard at the same rate, and that she refused to sell, and that Murdock had bought at over $1,200 per acre as a matter of speculation. Under the circumstances the defendants cannot be presumed to have been ignorant of the fact last mentioned. The influences brought to bear upon Green seem to have been effectual. He gave up the contract with Mrs. Bronk, and nothing is further disclosed in the case as to the forgery. The deed to Asa, of October 9, 1851, followed as a matter of course. It does not appear that the grantors, when they executed it, were any more enlightened than when they entered into the original contract. In 1856, Henry and Asa visited Saginaw for the purpose of procuring the deed of confirmation. Asa brought the Bronks to his father. The sum of nine hundred dollars was paid to them, the deed was presented for execution, and they executed it. Both Henry and Asa testify that it was read over and explained to them. It is very long and very intricate in its details. (Bronk is dead.) Mrs. Bronk says that she did not understand it. Few lawyers, however well trained to analysis, we imagine, could comprehend it fully without reading it more than once, and making notes of its contents. The Bronks had no counsel present to advise them. It is not alleged that the defendants made known to them either of the material facts which were suppressed when the contract and the first deed were executed, or the utter invalidity of that deed, or the sales that had been subsequently made and their results; or that if she did not execute the deed she would be entitled to receive in cash or good obligations, and unsold lots, at least $18,000, and that if she did execute the deed and receive the sum offered, she would, in fact, be paid that amount out of her own money then in the hands of Henry Stoddard. If these disclosures had been made, it is incredible that the deed of confirmation would have been executed. Without them how is it possible to support the deed? There is a good deal of testimony in the record given by the complainants which is contradicted by the defendants. In all such cases I have laid the testimony out of view. While I entirely approve the statute which allows parties to testify in their own behalf, I should not deem it proper to found a decree for relief, in whole, or in part, upon the testimony of a plaintiff positively contradicted by the defendants, unless such testimony is so corroborated as to leave in the judicial mind no reasonable doubt of its truth. I think the computation made by one of the counsel for the complainants, of the quantity of land belonging to the share of each heir, substantially correct.

|  |  | Acres |
|---|---|---|
| 350 arpens, reduced to acres.......... |  | 297 74 |
| Deduct Lawless's 1-5 aparted to acres. |  |  |
| Mills & Beaumont.............. | 42 70 |  |
| Deduct for expenses.......... | 15 | 57 70 |
|  |  | 240 04 |
| H. Stoddard's 1-10............. | 24 |  |
| T. Ewing"s 1-10.............. | 24 |  |
|  |  | 48 |
|  |  | 192 04 |
| Major Stoddard's six heirs each 1-6— 32 acres x 6...................... |  | 192 |
| Lucy Bunnel's seven heirs, each 1-7 of 1-6—4.57 acres x 7................ |  | 32 |

Asa paid the three Bunnels at the rate of $218.81 per acre. The purchase of Mrs. Bronk's interest was made later, and he paid a trifle more for it. The true value of the land in January, 1851. What was the value of the land when he bought out the interests of the Bunnels? The defendants examined six witnesses on the subject. They estimate it, except the one last named, who gives no estimate, as follows: John H. Hall, $400 to $500 per acre; Albert Todd, $400 per acre; John Krum, $300 to $350 per acre; James F. Donaldson, $200 to $300 per acre; Richard Q. Elliott, $200 to $400 per acre.

Hiram W. Leffingwell says: "The property was not, in January, 1851, in a condition to be sold to persons wishing to build or occupy, but only for purposes of speculation. It had no known price or value, as a whole or in parcels, in the market at that time."

These witnesses all lived in St. Louis, and are very intelligent upon the subject. They belonged, at the time their testimony was given, to these firms. Leffingwell & Elliott were real estate dealers and auctioneers. They were employed by Henry Stoddard to sell the property at auction in the fall of 1851. They did all in their power to attract public attention to the lots, and to make them bring as much as possible. Krum and Todd were the local attorneys employed by Henry Stoddard to attend to the litigation relating ·to the trust property. The complainants examined thirteen witnesses. Their estimates are as follows: John J. Murdock, $1,200; Levin H. Baker, over $2,000; John Baker, over $2,000; Henry B. Belt, $2,000; Daniel R. Garrison, $1,200; Wm. M. McPherson, $1,200 to $1,500; Daniel D. Paige, $2,000; Wm. H. Cozzen, $2,500; Charles R. Dickson, $1,200; Theodore P. Green, $2,000; Jacob P. Firrill, $1,200 to $1,400; Norman Cutter, $1,200; A. A. Stoddard, $1,200 to $1,500. The average of these estimates is $1,550 per acre. The testimony of four of these witnesses deserves particular attention. · Amos A. Stoddard lived on the land for the benefit of the heirs from the fall of 1847 to the fall of 1851. He owned a third of a sixth by inheritance and another third by purchase from the heirs of Curtis Stoddard. His estimate is from $1,200 to $1,500 per acre, clear of the costs of the litigation. He thinks the property could have been sold at those rates.

John J. Murdock was a merchant. He lived in St. Louis twenty-five years. He was a dealer in real estate. On the 30th of November, 1850, he bought one-twelfth of the tract not subject to claim of Messrs. Ewing and Henry Stoddard, and paid for it $30,000 cash; this was more than $1,200 per acre. He thought at the time he had a margin for profit of $2,000 per acre. Chas. R. Dickson was the partner of Murdock. He had lived in St. Louis the same length of time and dealt in real estate when he saw an opportunity of buying on terms which suited him. The purchase of Murdock was made for Murdock and himself jointly. Before buying he consulted the eminent law firm of Greer & Dayton, who assured him that "the Stoddard title was undoubtedly good." He thinks they bought cheap. His estimate of the value of the property at the time referred to is $2,000 per acre. Daniel R. Garrison lived in St. Louis thirty years. In the spring of 1851, he and his brother purchased the interests of several of the heirs, comprising nearly fifty acres. He paid $1,000 per arpen. Before buying he consulted Messrs. Grant, Gamble & Geyer as to the title. They pronounced it good. His estimate is that he paid $1,000 per arpen, which is about $1,200 per acre. The other nine witnesses were in nowise connected with the parties or the property. Judging from the record, it would seem that thirteen witnesses could hardly

have been found whose testimony upon the subject would be of higher moral value. In this connection it is proper to recur again to the purchase by Mr. Ewing and Asa of the title, with the approbation of Henry Stoddard. They bought Mrs. Foster's interest in April, 1851, at $1,125 on account. On the 12th of June, following, they bought the interest of Amos Stoddard at the same price. Between the time of the purchase of the Bunnels and these purchases, it is not shown that any change had taken place in the situation or value of the property. The purchase from the Bronks was made after those of Mrs. Foster and Amos A. Stoddard. After the decision in Mills v. Stoddard [8 How. (49 U. S.) 345], in the spring of 1850, Henry Stoddard, as far as the record discloses, always spoke and wrote of the title as finally established. The only difficulty he alleged was in regard to getting possession. In September, 1851, Messrs. Gant and Bates gave their opinion, which was published, that there could be no interference by any common field-lot title. Mr. Darby, who was the counsel for most of the defendants in the ejectment cases pending in the circuit court, and the warrantor of the adverse title held by many of them—upon learning the result in Mills v. Stoddard [supra]—advised them to make no further resistance, and judgments were accordingly entered by counsel. No witness has testified that after these judgments were rendered Henry Stoddard could not have obtained possession whenever he chose to issue writs of habere facias.

The following passage occurs in the deposition of Mr. Darby: "10th Question—How many of said defendants were you attorney for; and what course did they pursue in regard to the possession after the judgments were obtained? A. I don't recollect how many I was counsel for—ten or fifteen perhaps. I advised them to give up, notwithstanding their rights had been, as I conceived, grossly outraged. There was no remedy. They gave up. I heard of no resistance afterwards." Amos A. Stoddard says: "There was no threatening of force or resisting the officers to my knowledge. * * * At this time several of the claimants expressed themselves pleased to know that there was now a way by which they could get a good title. These showed a disposition to make no further opposition. A company that had been making brick on the tract made an application to Henry Stoddard for a lease for a year. A lease was given to the applicant. I do not recollect the name. I never heard Henry Stoddard express a doubt as to the Stoddard title being good. He never expressed any apprehension at all about being able to get possession, whenever he should issue the proper writs." There is other testimony to the same effect, upon this subject, but it is deemed unnecessary particularly to advert to it. The school claim is named by some of the

witnesses. That was found upon examination to be utterly groundless, the school having elsewhere "received their full quantity, under the act of 1812." The record discloses no adverse claim, other than those which have been mentioned.

The great fire of St. Louis occurred in May, 1849. It appears that the buildings destroyed by the great fire were replaced within eighteen months. It depressed even the real estate burned over, but a very short time. The property speedily appreciated. Several intelligent witnesses think the fire benefited the city, by bringing in the money received for insurance, and clearing the way for the better buildings which were speedily erected. The cholera prevailed as an epidemic in 1849, and to a more limited extent in 1850. John Byrne says: "These events had merely a temporary effect, which lasted until the cholera had disappeared and the burned buildings could be rebuilt. * * * The depression did not extend until 1851." Sylvester Papin says: "My conviction is, that the years 1850, 1851, and 1852 were peculiarly prosperous years. I was then connected with the city government, &c. * * * The prospects of St. Louis in regard to the increase of her population and business prosperity at the close of 1850, and the beginning of 1851, were bright and promising." Charles R. Dickson, Oliver Garrison, Theodore Greene, and John Dagget, also testify that the fire and the cholera exerted no effect upon the value of property as late as 1851. The Hon. John Hogan says: "I am not prepared to say, as before stated, that the fire had more than a temporary effect on the progress of St. Louis. Indeed, business of all kinds, manufactures, improvements, &c., seemed to have received a fresh impulse soon after those apparent calamities, and the city, in all its material interests, grew more rapidly than before, so that I have always regarded the great fire as a real blessing to the place, promotive of most valuable improvements." Whatever may have been the influences of these causes of depression in January, 1851, it is clear that they did not reduce the market value of the property in question at that time below $12 per acre. This proposition is satisfactorily sustained by a great preponderance of evidence. The facts warrant, and indeed enforce, the conclusion that this was known to the defendants at the time the purchases were made from the Bunnels. Was Henry Stoddard a sharer with Asa in the purchases from the Bunnels and the Bronks, as charged in the bill? Henry Stoddard was asked in his cross-examination as a witness to give an account of his receipts and disbursements with respect to Asa's share of the trust property. He referred to his answers given to other interrogatories, and added: "I decline to give any other transactions with Asa, unless the court order it, as it cannot be material unless the court order an account to be taken. My account with Asa involved many compromise transactions. It was always kept strictly." He gives attached to his deposition, as Exhibit 64, "an account of the sales and partition of the Stoddard addition to the city of St. Louis, as settled December 3, 1851. In that account the following statement appears:

| | |
|---|---:|
| H. Stoddard and A. P. Stoddard and others' account, subject to H. Stoddard's cost bill, viz.: | |
| H. Stoddard's fees, 10 per cent.. | $ 63,012 00 |
| Daniel Stoddard's heirs' share (net) | 90,749 45 |
| Lucy Bunnel's share, six-sevenths, part of which belongs to said A. P. Stoddard. | 90,749 45 |
| Asa P. Stoddard's one-third of one-sixth, under assignment from Amos A. Stoddard | 30,249 80 |
| Said A. P. Stoddard's one-fourth of one-sixth, part of the Foster share, and assigned to him by Ewing | 22,687 38 |
| Total subject to H. Stoddard's control | $298,348 08 |

This shows, as doubtless it was intended to show, that Asa's purchases were, as they appeared to be, solely for himself, and it can hardly be doubted that it was intended to make the further impression that they or the proceeds still belonged to him when the deposition was taken. In consequence of a remark made by the court at the hearing, leave was subsequently asked to file, as evidence in the case, the account withheld when the deposition was taken. Leave was given. The account was filed and is before us. It does not show anything that purports to be a "compromise transaction" between Henry and Asa. Why is this? It shows a settlement on the 3d of July, 1862, to which Henry, Asa, and others interested were parties. In this statement the proportion of the funds as it existed on the 3d of December, 1851, assumed and claimed to belong to Henry, is, instead of $63,912, enlarged to $116,849. This aggregate is the precise amount of the $63,912 claimed by Henry in the settlement of 1851, with the addition of the proceeds of the interest bought from the Fosters and Amos—taken from Asa and given to Henry. Asa is here represented as owning only the six-sevenths of the Bunnel share, five of them being those in controversy and one not in controversy, bought by Asa of another party. The subsequent avails of the property were divided into the same proportions. The settlement was signed by the parties. It shows conclusively that the interests bought of the Fosters and Amos belonged then to Henry. How did he acquire them? Was it by one of those "compromise transactions" referred to in his deposition? and was that compromise that Asa should have the Bunnel shares and Henry the others? No separate debit account in favor of Asa and against Henry is given. A debit account against Asa appears. Affixed to a part of it is this memorandum: "The foregoing account of payments made

to me, examined and found correct. Asa P. Stoddard. October 5, 1856."

In this part of the account are charges purporting to have been made in January, February, and March, 1857. This is unexplained. It is to be borne in mind that Henry has the same apparent connection with the purchases from the Bunnel heirs, as with those from the Fosters and Amos A. Stoddard. The purchases were all made by Asa in his own name. He took the titles to himself, and was held out to the world as the owner. In relation to all of them, Henry furnished alike his name, his means, and his credit. The whole cost of Asa's purchases, including interest up to this last payment, which matured in October, 1856, was over $34,000. The entire amount of Henry's payments to Asa down to the close of 1856, including $2,919.63, accounted for by Henry as guardian, was $11,968.52. Of this sum it appears only $8,948 was applied to Asa's contract, leaving him destitute of means to meet his engagements to the extent of more than $25,000. The debit account against Asa does not show a dollar which was applied to either the purchase from the Fosters, or from Amos. Henry must have paid for them, and he does not seem to have thought it worth while, even pro forma, to charge the amount or any part of it in his account against Asa. The profits on these interests when the settlements of 1862 were made, must have been large, perhaps not less than $50,000. By what right did Henry appropriate this fund to himself? That account throws no light on the subject. Even as regards the Bunnel shares, the account and other evidence in the case, as we understand them, show a large fund and a large amount of property, apparently belonging to Asa, still in the hands of Henry. Asa has reached middle life. Why were they so long withheld from him? Was it because some one else claimed the right to share in them with him, and that their respective claims had not been adjusted? It is hard to account for this feature of the case upon any other supposition. Whether Henry Stoddard was or was not interested with Asa in the purchase in controversy, is a question which, in the view we take of the case, is not necessary for us to decide, and we express no opinion upon the subject. The circumstances of his connection with the purchase from the Fosters and Amos, made undeniably manifest by the account, greatly fortify the presumption arising from the other evidence of fraudulent complicity, at least on his part, in the transactions of Asa, impugned by the plaintiffs in their bill.

The Law Considered. The legal principles which apply as far as the case has been considered are well settled. "It is an ancient and well-established principle that whenever suppressio veri or suggestio falso occurs, and more especially both together, they afford a sufficient ground to set aside any release or conveyance." In Story's Equity Jurisprudence (pages 201, 202) it is thus stated: "Wherever the party intentionally, or by design, misrepresents a material fact, or produces a false impression, in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage of him, in every such case there is a positive fraud in the truest sense of the term; there is an evil act with an evil intent; 'dolum malum, ad circumveniendum.' And the misrepresentations may be as well by deeds or acts as by words; by artifices to mislead as by positive assertions. Whether the party thus misrepresenting a fact knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the confirmation of what one does not know, or believe to be true, is equally, in morals and law, as unjustifiable as the affirmation of what is known to be positively false. And even if the party innocently misrepresents a fact by mistake, it is equally conclusive; for it operates as a surprise and imposition on the other party. Or, as Lord Thurlow expresses it, in Neville v. Wilkinson [1 Brown, Ch. 546], it misleads the parties contracting on the subject of contract." The author of the treatise last cited thus states the modifications of the doctrine; "The misrepresentation must be of something material, constituting an inducement or motive to the act, or omission of the other, and by which he is actually misled to his injury. In the next place, the misrepresentations must not only be in something material, but it must be something in regard to which the one party places a known trust and confidence in the other. It must not be a mere matter of opinion, equally open to both parties for examination and inquiry; and where neither party is presumed to trust to the other, but to rely on his own judgment." Smith v. Richards, 13 Pet. [38 U. S.] 36, 37. It is a circumstance deserving of attention who made the first proposition. Morse v. Royal, 12 Ves. 375. Inadequacy of price, though not by itself sufficient to avoid a sale, is, in connection with circumstances of suppression or misrepresentation, entitled to great weight. Cockell v. Taylor, 15 Eng. Law & Eq. 101. The fraudulent purchaser becomes ipso facto a trustee for the party defrauded. Hill, Trustees, 146. Courts of equity have power to relieve against deeds and judgments, not only when obtained by fraud and imposition, but also when regularly obtained, if there are circumstances of extraordinary hardship or great inadequacy of consideration. McDonald v. Neilson, 2 Cow. 193; Cranston v. Johnston, 3 Ves. 170. In such cases equity annuls the whole transaction. Whelan v. Whelan, 3 Cow. 577; Daubeny v. Cockburn, 1 Mer. 644. If the fraud be such that, had it not been practiced, the contract would not have been made, then it is material. 2 Pars. Cont. 770. In Turner v. Harvey, Jac. 178, Lord Eldon adverts to

the general principle that parties dealing for an estate have a right to put each other at arm's length, and that if the purchaser knows there is a mine on the estate, and the vendor makes no inquiry, the purchaser is not bound to give the information; but he says: "Very little is sufficient to affect the application of that principle if a word, if a single word be dropped which tends to mislead the vendor, the principle will not be allowed to operate." See, also, Laidlaw v. Organ, 2 Wheat. [15 U. S.] 178. If the purchaser does not act, or make any declaration, with the intention of misleading the seller, and preventing him from ascertaining the situation of the property, and at the same time conceals from him a fact which he knows to be material, he is guilty of a fraudulent deception. Livingston v. Iron Co., 2 Paige, 393. "Independent of other circumstances," as observed by Roberts on Fraudulent Conveyances (page 452), "the very proximity of blood raises rather the idea of confederacy than affection." Sands v. Codwise, 4 Johns. 584. Lord Justice Bruce said: "Once make out that there has been anything like deception—intentional deception—and no contract resting in any degree on that foundation can stand. Reynell v. Sprye, 13 Eng. Law & Eq. 113. In Dunbar v. Tredennick, 2 Ball & B. 317, the chancellor said: "To have any effect or validity as a deed of confirmation, it must be shown that the party was fully acquainted with his rights; that he knew the transaction impeachable which he was about to confirm, and that with this knowledge, and under no influence, he executed the deed. This would be required on such a transaction between strangers. How much more then is it required on the part of this agent and trustee in order to effectuate this as a deed of confirmation." To the same effect, and fully as strong, are Murray v. Palmer, 2 Schoales & L. 486, and Boyd v. Hawkins, 2 Dev. Eq. 215. In Evans v. Llewellin, 1 Cox, 339, the master of the rolls said: "It has been truly argued that no facts were in this case kept back from the party—no false recitals in the deeds—but that all the instruments contain a full discovery of the facts upon which the plaintiff was to make his bargain. Notwithstanding, I am of the opinion that the agreement ought not to stand. I lay great stress upon the situation of the parties to it, and the persons who compose the drama. The plaintiff, Thomas, was in mean circumstances, and wholly ignorant of his rights until the moment of the transaction taking place. He was then at once told of the title to this estate, and at the same time came the offer for a large sum of money if he would relinquish it. * * * I do not say that the confirmation of an act, not in itself valid, will not in any case hold without an adequate consideration. There certainly may be cases put in which such confirmation would be effectual if proper

time were allowed to the party, and due caution used in making him aware of the consequences. But here is a man destitute of money, and two hundred guineas are suddenly offered him which, to a man in his circumstances, is a very important sum, and he is called upon to convey an estate in prejudice of himself and family, for the benefit of a person in affluent circumstances. It is said he was cautioned by Mr. Maddock; it is true, and so far the parties did right. But they ought to have gone further. They should not have permitted the man to have made the bargain without consulting his friends. There was not sufficient locus penitentiae. There was no person present to give him advice. He was in their hands, and surprised at the unexpected acquisition of fortune."

The appositeness of these remarks to the case under consideration needs no observation. In Jackson v. King, 4 Cow. 221, the court said: "The distinction between legal and equitable jurisdiction upon fraud is this: that at law it must be proved, and not presumed. . . . The broad ground assumed by Lord Mansfield (1 Burrows, 391) is, that courts of equity and courts of law have a concurrent jurisdiction to suppress and relieve against fraud. The doctrine has, however, been subsequently modified according to the distinction taken by Lord Eldon, which is founded on good sense. I am not aware of any express adjudications in our courts. But in 4 Desaus. Eq. 684, it is sanctioned. It was there held, that fraud may be presumed in equity, but must be proved at law. In accordance with these principles a variety of cases have been decided and relief afforded in equity where, from the nature of the transaction, fraud and imposition might be presumed." 3 P. Wms. 129; Pow. Cont. 31. I am not entirely satisfied with the rule as thus laid down. As respects setting aside or annulling the conveyance, my understanding is, that a court of law can entertain no question but those which relate to the execution of the instrument (as where the instrument is misread to the grantor, or one draft is fraudulently substituted for another). Belden v. Davies, 2 Hall, 446; Hartshorne v. Day, 19 How. [60 U. S.] 211. But proof of the fraud relied upon, I apprehend, is as necessary in one form as the other. But in either case it must be sufficient to satisfy the mind to which it is addressed, and it must establish a wrong of such a character as to warrant the judicial action which is invoked. In this class of cases the injured party has the option to rescind in equity, or sue at law for damages. Bradley v. Bosley, 1 Barb. Ch. 149; 2 Pars. Cont. 783. Where he elects to rescind, the "law which abhors fraud does not incline to permit it to purchase indulgence, dispensation, and absolution," by any measures of compensation from the wrong-doer. Boyce v. Grundy, 3 Pet. [28 U. S.] 219. This is the distinction between the legal and the

equitable remedy. A trustee, unless he is only nominally such, as trustees to preserve contingent remainders, cannot, either directly or indirectly, by interposing another, acquire an interest in the trust property, by any sale, public or private, he may make. Nor can he validly act for another touching the sale. This principle applies alike to trustees appointed conventionally, and to those appointed by authority of law. To the latter category belong executors, administrators, guardians, and commissioners and assignees in bankruptcy.

The principle is also applied with equal vigor to all employed in any relation of confidence to the trustee, or cestui que trust, or the trust property. The rule includes attorneys, solicitors, their managing clerks, agents, and all others acting in a capacity which gives facilities for acquiring information not open to all the world. If such persons buy for themselves or others, a court of equity, upon being applied to by the proper party, will, without reference to its fairness, annul the transaction, upon consideration of public policy. The law will not tolerate so dangerous a conflict of interest and duty. All the fiduciary learns, and all that he can do, the cestui que trust has a right to claim the benefit of. This disability springs from the relation of the parties. The law will not permit the agent to be both seller and buyer. It proceeds upon the considerations that integrity might give way, and corruption prevail, and that the fraud might so hide itself as to escape detection. Hence the rule that the fact itself of the purchase once established, is fatal to the transaction. The law will not allow the agent to be led into such temptation. It seeks to keep the fountain pure by shutting out, as far as practicable, the possibility that it should be made otherwise. 2 Sugd. Vend. 109; Adams, Eq. 216; Hill, Trustees, 785; Michoud v. Girod, 4 How. [45 U. S.] 554; Davoue v. Fanning, 2 Johns. Ch. 252; Ex parte James, 8 Ves. 337; Ex parte Bennett, 10 Ves. 385; Coles v. Trecothick, 9 Ves. 234; Lowther v. Lowther, 13 Ves. 95.

There is no positive rule that the trustee may not buy of the cestui que trust; but, in order to do so, he must fully divest himself of all advantages which his character of trustee might confer, and must prove, if the transaction be afterward impugned, that it was in all respects fair and honest. Adams, Eq. 217. In Coles v. Trecothick, 9 Ves. 244, Lord Eldon said: "I agree that the cestui que trust may deal with the trustee, who may become the purchaser of the estate. But though permitted, it is a transaction of great delicacy, and which the court will watch with the utmost diligence, so much that it is very hazardous for a trustee to engage in such a transaction." And again: "A trustee may buy from the cestui que trust, provided there is a distinct and clear contract ascertained to be such after a jealous and scrupu-lous examination of all the circumstances, provided that the cestui que trust intended the trustee should buy; and there is no fraud, concealment, no advantage taken by the trustee, of information acquired by him in the character of trustee. I admit it is a difficult case to make out wherever it is contended that the exception prevails." Lord Erskine, in Morse v. Royal, 12 Ves. 372, said there was so much difficulty in supporting a purchase by a trustee, and it required to be guarded with so much jealousy, that it would have been better to have interdicted it altogether. It is a principle recognized in all the authorities, that the burden of proof lies on the purchaser. Some of the tests which have been applied in such cases will be adverted to. Inadequacy of consideration may well be considered an item that gives the character of fraud to the transaction. Whelan v. Whelan, 3 Cow. 575. If the court sees the "least speck of imposition at the bottom; if there be the least scintilla of fraud," the court will interpose. Id. 577. The agent must make it perfectly clear that he furnished the cestui que trust with all the knowledge which he himself possessed. Gross inadequacy of price is strong evidence. He should advise that some one else be consulted as to the value, and he must make it manifest that he gave all the reasonable advice against himself that he would have given against another. Gibson v. Jeyes, 6 Ves. 278. He must show that he has dealt with the other party with the utmost good faith, taking no advantage of his influence, but representing everything fairly. Boney v. Hollingsworth, 23 Ala. 698. When a party is obliged to rely upon the statements of another, and not only may, but should, repose peculiar confidence in him, this is the nature of a special trust, and the law is very jealous of the betrayal of this trust, and visits it with great severity. 2 Pars. Cont. 774. It is a fraud against which equity will relieve. Shaeffer v. Sleade, 7 Blackf. 178. It is the duty of the trustee to see that the cestui que trust is properly advised. Lloyd v. Attwood, 3 De Gex & J. 615. A solicitor or attorney cannot take advantage of his own ignorance, negligence, or indiscretion; and if he acquire the property of the client in a manner inconsistent with his duty, he will be taken to hold it as a trustee. Bulkley v. Wilford, 2 Clark & F. 177; Jackson [Stockton] v. Ford, 11 How. [52 U. S.] 233; Poillon v. Martin, 1 Sandf. Ch. 565. Although the confidential employment ceases, the disability continues as long as the reasons for which it is founded continue to operate. Carter v. Palmer, 8 Clark & F. 657. A solicitor is bound to prove that he paid that price which he would have advised the client to accept from a third person. Champion v. Rigby, 1 Russ. & M. 539. A grossly inadequate price causes a strong, and in general a conclusive, presumption, though there is no direct proof of fraud, that undue advantage has been taken of the ignorance, the weak-

ness or the necessity of the vendor, and this imposes on the purchaser a necessity to remove this violent presumption by the clear-est evidence of the fairness of his conduct. Butler v. Haskell, 4 Desaus. Eq. 697. If the trustee be concerned in a fraud with another person, who thereby acquires the trust prop-erty, a party so circumstanced cannot re-quire that cestui que trust shall treat the lia-bility of the stranger as distinct from that of the trustee. "The fraud is one and indivisi-ble." Lund v. Blanshard, 4 Hare, 27. Where the trustee has acquired the trust property, the cestui que trust may file a bill in affirm-ance of the original right, and set out any number of conveyances improperly obtained, and ask to have them put out of the way or to have conveyances; "for the several con-veyances do not so much constitute distinct subjects of litigation, but are rather so many barricades erected by the defendant to im-pede the plaintiff's progress toward his rights." Bedsole v. Monroe, 5 Ired. Eq. 317. Parties dealing with a trustee who misap-plies the trust property cannot avail them-selves of such transactions as a defense against the cestui que trust. Jackson v. Up-degraffe, 1 Rob. (Va.) 120.

X. Our conclusions are: 1. The avowed object of sending Asa to the Bunnels was a pretext, and not the cause. It was intended to veil the real motive of the journey—which was to buy out the heirs. 2. Henry, in his letter of the 14th of January, suppressed important facts, which it was his duty as trustee, and otherwise, to communicate. The letter was evasive and deceptive, and wrought the purpose of misleading, which it was intended to accomplish. 3. The same suppression was practiced by Asa, and he misrepresented the property and the pros-pect of further litigation. 4. In regard to the interests bought of the Bronks, there were the same suppression and misrepresen-tations by Asa; and the suppression of still more important facts by both the defend-ants. 5. By these means Asa was enabled to purchase the property for less than one-fifth of what it is worth, and could, at the time, have been sold for in the market at St. Louis. 6. In relation to the deed of con-firmation there were suppressions which are conclusive. 7. Asa occupied a trust relation to the property, which disabled him from purchasing, except upon the principles which govern the dealings of trustees and cestui que trust. 8. The wrongs committed by the defendants upon the vendors were joint throughout. Before the work was begun they combined and confederated for a pur-pose, and wrought together until that pur-pose was accomplished. 9. Their wrongs destroy the rights which Asa claims to have acquired. 10. The complainants must pre-vail unless their case is fatally met by one or more of the legal objections taken by the defendants, which remain to be considered.

XI. It is objected that the bill is multi-farious. The objection was taken by the an-swer, and the attention of the court was not called to it until the hearing. As stated in the answer, the ground of the objection was, that five distinct sets of complainants had united five distinct causes of action in the bill. It has since been extended or modified. In a very able argument, submitted since its hearing, it is insisted: First, that by the contract with Lucy Bunnel, the first, and her husband, with Henry Stoddard, and their subsequent conveyance to him, her in-terest in the property ceased in equity to be realty and became wholly personalty, and that for any breach of duty by the trustee, her personal representative is the proper person to sue, and the only one who can do so. Second, that if the conveyances to Asa were procured by fraud—those instruments relating to personalty and not realty—the parties defrauded, who are living, and the personal representatives of the deceased, are the proper persons to sue, and that the heirs-at-law of the decedents are misjoined as complainants. And third, that these dis-tinct causes are improperly joined in the bill.

The objection comes too late. It should have been made by demurrer before the de-fendants answered. After the labor, ex-pense, and delay, incident to the prepara-tion of the cause for hearing, a defendant is not allowed to interpose this objection. Whaley v. Dawson, 2 Schoales & L. 371; Wynne v. Callander, 1 Russ. 293; Ward v. Cooke, 5 Madd. 122; Campbell v. Mackay, 1 Mylne & C. 603; Nelson v. Hill, 5 How. [46 U. S.] 133; Bryan v. Blythe, 4 Blackf. 249; Grove v. Tresh, 9 Gill & J. 281. We had occasion to examine this point freely in the case of Boyce's Heirs v. Halliday and others, in this court, and deem it unneces-sary to reproduce the views which led us to our conclusions. The court may itself sua sponte raise the objection, but, the case having been fully prepared and argued, we see no reason for the exercise of this power. If, however, the objection had been made at the proper time, we think it could not have been sustained. The analysis present-ed in the argument referred to is probably correct. But the consequences insisted upon, by no means follow. The complainants, oth-er than the administrators, are distributees of Lucy Bunnel the first, of Lucy Bunnel the second, and of Anthony S. Bunnel. The es-tates of the decedents are all settled, and all their liabilities satisfied. Under such cir-cumstances, the distributees before the court may well maintain the suit, and there is no necessity for subjecting them to the expense, hazard, and delay of having the fund pass into the hands of the administrators, and of devolving upon them the duty of paying it over to the parties ultimately entitled to re-ceive it.

The rights of the heirs to litigate, and to re-ceive directly the fruits of the litigation, has the sanction as well of authority as of

reason. McDowl v. Charles, 6 Johns. Ch. 132; Goodyear v. Bloodgood, 1 Barb. Ch. 617; Babbitt v. Bowen, 32 Vt. 437; Nunnally v. White, 3 Metc. (Ky.) 584; Buchan v. James, Spears' Ch. 375. In this view of the subject, the administrators are not indispensable parties, and the bill might, perhaps, be dismissed as to them (18 Ohio, 72); or they may be regarded as nominal parties, whose presence or absence is never material in a suit in chancery (Story, Eq. Pl. §§ 221, 229; Wormley v. Wormley, 8 Wheat. [21 U. S.] 451). There is an obvious convenience and fitness in uniting in the suit the administrator of Lucy Bunnel the first, with other complainants. He alone could not have litigated the validity of the assignments and of the deed of confirmation. If it had turned out upon the hearing that the estate was unsettled or insolvent, it would have been necessary to dismiss the bill or stop the case, and allow the bill to be amended by making her personal representative a party. If the parties wronged, who are living, and the personal representatives and distributees of those who are dead, had sued merely to vacate the transfers, and a decree had been rendered in their favor, another suit might have been found equally necessary to reach the trust property, and compel the execution of the trust. The defendants would have been the same, and both suits would have involved the trust property. As the case is presented, the entire controversy in all its branches can be settled in a single suit, without embarrassment to either party arising from any complication of the case. In England the trustees and the cestui que trust may be joined as co-plaintiffs in a suit relating to the trust fund. Hill, Trustees, 796. In this country it had been held that, though not necessary, their joinder is unobjectionable. Jennings' Ex'rs v. Davis, 5 Dana, 127. If the representative of Lucy the first had sued alone, and enforced the execution of the trust, he would have held the proceeds as a trustee for the other complainants in this case. Why may not the beneficiaries be joined with him in the suit?

The objection, as stated in the answer, that the bill embraces five distinct cases, is also untenable. No definite rule can be laid down upon the subject of multifariousness. Every case is governed by its own circumstances. The question is to be decided according to the sound discretion of the chancellor. He is to be careful not unnecessarily to split up causes, multiply suits, and increase the expense of litigation. He is to be equally careful not to oppress the defendant and embarrass the administration of justice, by allowing causes to be united which have no necessary connection. Campbell v. Mackay, 1 Mylne & C. 603; Gaines v. Chew, 2 How. [43 U. S.] 619; Story, Eq. Pl. § 284. The authorities as to what constitutes multifariousness are numerous and conflicting. Mr. Justice Story says: "The result of the

principles to be extracted from the cases on this subject seems to be, that where there is a common liability—a common liability in the defendants, and a common interest in the plaintiffs—different claims to property, at least if the subjects be such as may without inconvenience be joined, may be united in one and the same suit." Story, Eq. Pl. § 533. Here the complainants all claim under two common sources of title, Major Stoddard, and his sister, Lucy Bunnel. They claim against a common trustee, made such by a contract and conveyance, executed by Lucy. They assert that a joint wrong has been done to them, or those whom they represent, by the defendants, involving the trust property, and they claim a remedy against both of them. The case is clearly within the rule laid down by Judge Story. The best considered authorities are equally decisive. Brinkerhoff v. Brown, 6 Johns. Ch. 139; Fellows v. Fellows, 4 Cow. 683; Shields v. Thomas, 18 How. [59 U. S.] 253; Fitch v. Creighton, 24 How. [65 U. S.] 161; Attorney General v. Cradock, 3 Mylne & C. 96; Mix v. Hotchkiss, 14 Conn. 42; Campbell v. Mackay, 1 Mylne & C. 622; Salvidge v. Hyde, Jac. 151, 5 Madd. 138.

XII. The objection that there is a misjoinder of parties plaintiff is sufficiently answered by what has been said in this connection upon the subject of multifariousness. This objection also comes too late. "If there is misjoinder of parties as plaintiffs, all the defendants may demur; . . . and in case of misjoinder of plaintiffs, the objection ought to be taken by demurrer; for if not so taken, and the court proceeds to a hearing on the merits, it will be disregarded, at least if it does not materially affect the propriety of a decree." Story, Eq. Pl. § 544. See, also, Raffety v. King, 1 Keene, 601; Morley v. Lord Hawke, 2 Younge & J. 520. But if the objection had been made in season it could not have been sustained.

XIII. Our attention has been called to alleged variances between the allegations of the bill and the proofs. We recognize the principle that they must substantially agree. A party can no more recover upon a case proved, but not alleged, than upon a case alleged, but not proved. Foster v. Goddard, 1 Black [66 U. S.] 518. We find no variances in this case which we deem material. The allegations are proved to a sufficient extent to sustain the bill. Gresl. Eq. Ev. 139, 241, 242; Taylor v. Benham, 5 How. [46 U. S.] 277; Matthew v. Hanbury, 2 Vern. 187; Sacket v. Hillhouse, 5 Day. 551; Hooper v. Holmes, 3 Stockt. [11 N. J. Eq.] 125; Baldwin v. Ely, 9 How. [50 U. S.] 580; Reynell v. Sprye, 13 Eng. Law & Eq. 102.

XIV. It is insisted that, as the validity of the deed of confirmation set up in the answer, was not put in issue by an amendment of the bill, it cannot be answered in the present state of the pleadings. Our opinion is that the charging part of the bill should

have been amended so as to raise the proper issue. 1 Barb. Ch. 250; Storms v. Storms, 1 Edw. Ch. 358. The objection should have been presented before the hearing by a motion to suppress the testimony relating to the subject. Blackburn v. Crawford, 3 Wall. [70 U. S.] 175. At the hearing it was too late, and must be held to have been waived. Under the circumstances, the traverse of this part of the answer, by the application, is sufficient. Mitf. Eq. Pl. 352.

XV. An equitable bar arising from the statute of limitations and lapse of time is set up by the defendants. The counsel upon both sides have stated fully and correctly the principles settled by numerous adjudications upon the subject. They are exhaustively examined by Chancellor Kent in the case of Kane v. Bloodgood, 7 Johns. Ch. 121. We do not propose to extend this opinion, already too long, by a discussion of the subject. We shall content ourselves with stating, as succinctly as may be, our conclusions, and the grounds upon which they rest. Henry Stoddard was a trustee in a direct trust. He is liable for his malversations, and the principle of the bar, in such cases, has no application. As Chancellor Kent said in Goodrich v. Pendleton, 3 Johns. Ch. 390, it would be a waste of time to look for authorities in support of such a proposition. We have found that Asa occupied such relations, that the same principles must be applied to his dealings with the cestui que trust as to those of the trustee himself. They united in a wrong whereby the cestui que trust lost, and Asa acquired, their property. Can he, any more than the trustee, avail himself of the protection of the bar? The supreme court of the United States has said: "In general, length of time is no bar to a trust clearly established to have once existed, and where fraud is imputed, length of time ought not to exclude relief. Prevost v. Gratz, 6 Wheat. [19 U. S.] 481. Within what time a constructive trust will be barred must depend on the circumstances of the case. Boone v. Chiles, 10 Pet. [35 U. S.] 177. There is no rule in equity which excludes the consideration of the circumstances, and in a case of actual fraud, we believe no case can be found in the books, in which a court of equity has refused to give relief in the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered or becomes known to the parties whose rights have been affected by it." Michoud v. Girod, 4 How. [45 U. S.] 561. Chancellor Kent said: "The defendant is charged with a breach of his trust, and with fraud in the execution of it. These charges formed an equitable bar to the plea of the statute, and they ought to have been fully, particularly, and precisely denied in the answer put in as an auxiliary to the plea." Goodrich v. Pendleton, 3 Johns. Ch. 388. These authorities are decisive. The bar insisted upon by the defendants does not exist.

We have not overlooked the other considerations bearing upon the subject, to which our attention has been called by the learned counsel for the complainants. We will briefly advert to them. First. If such a bar could arise in this case it could be only after the expiration of the statutory period, computing from the time of notice to the injured party. The burden of proving notice rests wholly upon the party alleging it. Shannon v. White, 6 Rich. Eq. 96; Blair v. Bromley, 5 Hare, 558; Sears v. Shafer, 2 Seld. [6 N. Y.] 268. Saying nothing of the sufficiency of proofs as to Amasa, Lucy, and Anthony Bunnel, in regard to which we express no opinion. There is none whatever as to Alvah and Mrs. Bronk. Second. The remedy sought is in part, at least, to reach the real estate, covered by the trust deed, still in the hands of the defendants, either for the purpose of taking it in specie upon the principle of election, or to have the trust executed upon it by Henry Stoddard or by another trustee, substituted in his place by reason of his unfaithfulness. If any part of the property has been transmitted into other property, or has gone into the hands of strangers, with notice, the cestui que trust can pursue it as far as it can be traced in our case, and as far as it has gone with notice in the other. And if, after it went into the hands of a bona fide holder, it was re-acquired by either of the defendants, the right to lay hold of it for the purposes of the trust at once recurred to the complainants, and may be enforced in this suit as a part of their remedy. These principles are applied in equity and in law. Oliver v. Piatt, 3 How. [44 U. S.] 401; Taylor v. Plumer, 3 Maule & S. 562. In this view the time necessary to create a bar by analogy would be twenty-one years. Third. If the vendors were deprived of their property by the joint fraud of Henry and Asa, the transactions of Asa with the vendors can afford Henry no protection. He must account for the trust property as if those transactions had not occurred. Attwood v. Lloyd, 3 De Gex & J. 614; 1 Rob. (Va.) 120. As to him there can be no bar; in his case the principle certainly does not apply. We prefer, however, to leave our discussion of this point wholly upon the ground first indicated, where we placed it.

We think the complainants are entitled to a decree. The case will be referred to a master, and all other questions will await the coming in of his report.